IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHAEL BALLOU; HENRY MARTINEZ;
MATTHEW SPINNATO; CESAR RICANO;
JEREMY FLYNN; JERRY PORCHIA;
DAVID GOODNIGHT; and DANA MOYE,

                Plaintiffs,

v.                                         Case No. 20-2640-JWB

UNITED PARCEL SERVICE, INC.,

                Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on Defendant's motion for summary judgment. (Doc. 71.) The motion is fully briefed and is ripe for decision. (Docs. 72, 75, 76, 81.) For the reasons stated herein, Defendant's motion is GRANTED.

### I.  Facts and Procedural Background

Plaintiffs are current full-time UPS employees who work as "Feeder Drivers," meaning they operate 18-wheel commercial vehicles that transport packages for UPS from hub-to-hub rather than from hub-to-customer. When they applied for employment, Plaintiffs were advised and acknowledged that their employment would be pursuant to an applicable collective bargaining agreement ("CBA"). (Doc. 72 at 5.)

Prior to their employment with UPS, Plaintiffs Martinez, Porchia, Goodnight, and Moye were all members of the same union—the Teamsters Local 41 (the "Union"). Since the beginning of their employment with UPS, Plaintiffs have been members of a collective bargaining unit represented by the Union. The Union has exclusive statutory authority to bargain for, negotiate,

and set the terms and conditions of employment for the bargaining unit, including all Feeder Drivers. Those terms and conditions of employment are set forth in three documents: (1) the National Master UPS Agreement ("the CBA"); (2) the Teamsters and UPS Central Region Supplemental Agreement ("CRS"); and (3) the Local Union Supplemental Agreement between UPS and Local 41 ("Local 41 Rider"). The current CBA is in effect from August 1, 2018, through July 31, 2023. (*Id.* at 6.)

The CBA, CRS, and Local 41 Rider contain provisions on wage rates, hours, and job protections applicable to Plaintiffs' employment. The CBA also covers terms and conditions of employment for all Feeder Drivers nationwide, including Plaintiffs. These documents are all available on the International Brotherhood of Teamsters' website. (*Id.* at 6-7.)

The CBA contains a multi-step grievance-arbitration procedure (Art. 8 of the CBA and Art. 5 of the CRS) to resolve "any controversy, complaint, misunderstanding, or dispute arising as to interpretation, application or observance of any of the provisions" of the CBA. The decision "reached at any stage [of the grievance-arbitration process] shall be final and binding on both parties." (*Id.* at 7.)

By virtue of an "individual agreements clause" in CBA Art. 6, Sec. 1, UPS cannot enter into or negotiate separate terms or side agreements with individuals or sub-groups of the bargaining unit:

> Except as may be otherwise provided in this Agreement, the Employer agrees not to enter into, or attempt to enter into, any agreement or contract with its employees, either individually or collectively, or to require or attempt to require employees to sign any document, either individually or collectively, which in any way conflicts with the provisions of this Agreement. Any such Agreement or document shall be null and void.

(Doc. 72 at 8.)

A job protection provision in the CBA (Art. 26, Sec. 1) states that if UPS adopts alternate means of transporting packages from hub-to-hub, no Feeder Driver with more than three years seniority in that classification will be laid off or displaced from that classification as a result of the change.  (*Id.* at 8.)  Another CBA provision requires UPS to give prior notice and meet with the affected local union in the event that a change in operations will result in a layoff of senior employees.   (*Id.*) (citing (CBA Art. 38, Sec. 1(a)).

Sections 2 and 3 of Article 41 of the CBA govern wage progressions applicable to the Plaintiffs here:

> The progression for employees entering a package car driving, feeder or other full-time job (other than an air driver, Article 43 jobs or a job covered by Sections 3, 4, or 6 below) after August 1, 2018 shall be as follows:

| | |
|---|---|
| Start | 21.00 |
| Twelve (12) months | 23.00 |
| Twenty-four (24) months | 24.00 |
| Thirty-six (36) months | 28.75 |
| Forty-eight (48) months | Top Rate |

> Part-time employees on the payroll as of July 31, 2018 who subsequently are promoted to full-time employment under this paragraph will be red circled until such time as the calculated progression rate exceeds that rate. The transfer date will become his/her full-time start date for purposes of applying the above progression.
> If a part-time employee bids to a full-time position and the top rate of the classification is less than his/her current rate, the employee shall be placed at the top rate of the new classification immediately.
>
> * * *
> Employees in the Article 41 Section 2(c) progression in the prior Agreement as of the date of ratification shall be slotted into the new progression above.

(Doc. 72 at 9.)

Article 41, Section 1 of the CBA provides that UPS can implement new premium shipping methods, but that "[n]o feeder driver will be laid off or displaced from a feeder classification as a

direct result of any provision in this article." (*Id.*)  If premium services require an additional classification of Feeder Driver, UPS must provide such employees a minimum four-day workweek.  UPS must also provide regular benefits to such employees, as well as the opportunity to work ten hours per day, four days per week.  (*Id.* at 9-10.)

Article 3, Sections 5 to 8 of the CRS contain processes for electing alternate work during layoffs of full-time employees, including displacing junior employees, obtaining new permanent jobs, and other options.  Article 3, Section 13 of the CRS contains provisions relating to the Feeder Driver Annual Bid, which occurs the third week in April each year.  It also contains provisions on temporary or other elimination of a Feeder Driver position.  (*Id.* at 10.)

The Local 41 Rider also has provisions relating to the Feeder Driver Annual Bid and UPS's ability to hire into Feeder Driver positions during the holiday season.  It also provides that for purposes of layoff, job selection, or displacement, Feeder Drivers are reviewed off a master seniority list including drivers in the Greater Kansas City Area, and not just a single facility.  (*Id.* at 11.)

Fall 2018 Recruitment Meetings

Although the CBA provides that full-time jobs such as Feeder Driver positions must be filled on a six-for-one basis using existing UPS employees, UPS can hire so-called "off the street" or external candidates if the internal pool of candidates is insufficient.  In the fall of 2018, UPS was looking to hire off-the-street Feeder Drivers after their internal pool was exhausted.  UPS held informational or "recruitment" meetings to share information about Feeder Driver positions.  Prior to accepting employment with UPS, each Plaintiff attended an initial informational or recruiting meeting on-site at Defendant's facility in Lenexa, Kansas, where they were provided information about employment.  UPS On-Road Supervisor John Lannon attended these meetings on behalf of

4

UPS.  Union representatives also attended the meetings.  As part of the meetings, Lannon provided information about the expected hours, rate of pay, and other particulars of the position, including the fact that employees had the right to join the Union as part of the job.  (Doc. 72 at 12.)

In the fall of 2018, UPS approved a Market Rate Adjustment (MRA) for Feeder-Drivers in Lenexa, Kansas, raising the hourly rate for Feeder Drivers from the CBA rate to $30 per hour. (Doc. 70 at 3.)  In meetings held after the MRA was approved, Lannon communicated to attendees that they could expect to make $30 per hour for Feeder Driver work.  (Doc. 72 at 13.)

During the recruitment meetings, Lannon also told attendees there could be layoffs, and that if there were, they would not be laid off to the street but could still work full-time inside the Hub and maintain their benefits.  (*Id.*)  Lannon said UPS had not had recent layoffs and did not expect layoffs.  (Doc. 75 at 2.)  Plaintiffs testified Lannon said that the pay rate for Feeder Drivers was a guaranteed $30 per hour, with expectations that it would increase over a four-year period, and that the hourly rate for Hub activities (non-feeder work) was $25 per hour.  (*Id.*)

Union President Ralph Stubbs testified the Hub rate discussed at the recruitment meeting he attended was the contractual rate for part-time or inside work, which he believed was about $5 per hour less than the CBA contractual rate for a Feeder Driver.  (Doc. 72 at 12.)

Plaintiffs' Employment with UPS

Plaintiffs accepted employment with UPS in the fall of 2018 in reliance on the express representations made by UPS at the time of hiring, including that they would be paid $30 per hour for Feeder Driver work and $25 per hour on a full-time basis for non-feeder work, including work in the Hub in the event of a layoff.  Upon joining UPS, Plaintiffs were paid $30 per hour for Feeder Driver work in accordance with the MRA.

In 2019, Plaintiffs were laid off at various intervals from feeder driving.  During those periods, seven of the eight Plaintiffs accepted at least some work in the Hub.  They were paid about $15 per hour for work performed in the Hub.  Plaintiff Moye never performed Hub work.  By the end of 2019, each Plaintiff was returned to work full-time.

The MRA rate expired in March of 2020, at which time UPS returned the Feeder Drivers, including Plaintiffs, from the MRA rate of $30 per hour to the CBA rate of $23 per hour.  Lannon testified he did not know that the $30 per hour MRA rate would expire until it had already expired, and that he was upset at that point because he had been telling employees they would be paid the MRA rate until they reached the full contractual rate.  (Doc. 72 at 13-14.)  He testified he "had no clue the MRA had an expiration date."  (Doc. 75-2 at 50.)

<u>Plaintiff Martinez NLRB Charge</u>

Plaintiff Martinez filed a grievance over the Hub pay issue, claiming UPS had promised to pay $25 per hour for Hub work.  The Union ultimately withdrew the grievance — that is, it evaluated and declined to pursue it.  The Union did not pursue an unfair labor practice (ULP) charge against UPS on the Hub pay issue because it had been the practice of UPS for many years to pay the CBA contractual rate for Hub pay.

On September 9, 2019, Martinez filed a ULP with the NLRB over the Hub pay issue (the "Hub ULP") alleging the Union "has restrained and coerced employees in the exercise of rights protected by Section 7 of the Act by refusing to process the grievances of Henry Martinez" regarding work performed in the Hub, and further alleging the Union "has refused to bargain collectively and in good faith with [UPS] by refusing to document and reduce to writing a supplemental agreement regarding market rate adjustments and pay rates for work in the hub." (Doc. 72 at 14-15.)  The NLRB investigated and considered the Hub ULP but dismissed it on April

8, 2020, stating that "Union officials emphatically stated they had never heard the Employer promise $25 for hub work." (*Id.* at 15.) The dismissal decision noted that the Union processed Martinez's grievance on the issue but withdrew the grievance after determining there was no contract violation. The NLRB stated that "oral agreements to modify a collective bargaining agreement could be enforced pursuant to Section 8(d) of the Act," which governs collective bargaining obligations, but that "it is understandable that the Union would be reticent to file a grievance where the likelihood of success was slim." (*Id.*) Martinez appealed the decision, but the appeal was denied on July 23, 2020, on the grounds there was insufficient evidence that the Union violated Sections 8(b)(1)(A) and (3) of the NLRA. On appeal, Martinez was represented by Plaintiffs' counsel in the instant matter. (*Id.*)

The MRA ULP

Some of the Plaintiffs filed grievances after UPS returned to the CBA pay rate in March of 2020. On April 27, 2020, the Union filed an unfair labor practice (ULP) charge with the NLRB against UPS, alleging UPS "failed and refused to bargain in good faith with the union as the collective bargaining representative of its employees by making unilateral changes in terms and conditions of its employment" by reducing Feeder Driver pay below an approved MRA rate of $30 per hour to the lower CBA rate. The MRA ULP claimed the reduction violated Section 8(a)(5) of the NLRA, which makes it an "unfair labor practice for an employer … to refuse to bargain collectively with the representatives of his employees." (*Id.* at 15-16.) The MRA ULP alleged that the reduction from the MRA rate began on March 19, 2020.

Because there was a grievance pending on the same issue, the NLRB accepted jurisdiction over the matter but deferred to the parties' grievance-arbitration procedures outlined in the CBA. The NLRB reserved the right to monitor the processing of the grievance and could resume

processing the MRA ULP if it deemed it necessary.  (*Id.* at 16.)  Thereafter, the Union and UPS

resolved the MRA ULP.  As part of that resolution, UPS agreed to (1) issue back pay to the affected

Union members to compensate for the reduction in pay rate, and (2) bring them back to the $30

per hour MRA rate.  (*Id.*)  All eight Plaintiffs were included in that resolution and received back

pay for the months of March 2020 to July 2020.  The gross payments received by Plaintiffs were

as follows: Moye - $5,298.75; Goodnight - $3,158.14; Porchia - $6,076.73; Flynn - $6,464.18;

Ricano - $4,288.37; Spinnato - $3,706.48; Martinez - $3,396.42; Ballou - $7,091.62.  (*Id.* at 17.)

The Union subsequently withdrew the MRA ULP, which the NLRB approved on January 31, 2021.

Plaintiffs remain employed by UPS, and those who remain in the Feeder Driver role continue to

receive $30 per hour for Feeder Driver work.

Plaintiffs allege that UPS promised that Plaintiffs would be paid $30 per hour for Feeder

Driver work and, in the event of layoffs from that position, that they would be paid $25 per hour

on a guaranteed full-time basis for work in the Hub.  Plaintiffs assert three claims under Kansas

common law: negligent misrepresentation; fraud through silence; and fraud/intentional

misrepresentation.  (Doc. 70 at 8.)

Defendant argues it is entitled to summary judgment because the claims are preempted by

federal law — either because of "*Garmon* preemption" (*San Diego Bldg. Trades Council v.

Garmon*, 359 U.S. 236 (1959)) or because of preemption under Section 301 of the Labor

Management Relations Act (LMRA), 29 U.S.C. § 185.  Alternatively, Defendant argues the claims

fail on their merits, including because there is no evidence that Plaintiffs reasonably relied on the

allegedly false representations made by UPS.

**II.  Legal Standards**

A.  **<u>Summary Judgment</u>**.  Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc*., 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Id*. Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

B. **<u>*Garmon* Preemption</u>**.  In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959) the Supreme Court "divested the states of the power to make laws over activities that are arguably protected or prohibited by the NLRA."  *Felix v. Lucent Techs., Inc*., 387 F.3d 1146, 1165 (10th Cir. 2004) (citing *Garmon*, 359 U.S. at 244). This "*Garmon* preemption" "applies when the 'controversy presented to the state court is identical to ... that which could have been, but was not, presented to the Labor Board.'"  *Id.* at 1165-66 (citation omitted.)  It is a reflection of Congress's decision to vest exclusive jurisdiction in the NLRB.  If it applies, neither a federal court nor a state court has jurisdiction; the case must be adjudicated by the NLRB.  *Id.* at 1166.

To show that an activity is "arguably" covered by the NLRA

mean[s] that the party claiming pre-emption is required to demonstrate that his case is one that the [NLRB] could legally decide in his favor. That is, a party asserting

pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been "authoritatively rejected" by the courts or the Board. [cite omitted] The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation.

*Int'l. Longshoremen's Ass'n v. Davis,* 476 U.S. 380, 395 (1986). *See also Butcher v. Teamsters Local 955,* No. 18-2424-JAR, 2018 WL 6200027, at *2-3 (D. Kan. Nov. 28, 2018) (noting that although the Supreme Court has characterized *Garmon* preemption as jurisdictional, it has placed the burden of demonstrating it on the party asserting it).

### C. <u>LMRA Preemption</u>

Section 301 of the LMRA provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter ... may be brought in any district court of the United States having jurisdiction of the parties...." 29 U.S.C. § 185(a). "This provision has been construed 'as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts.'" *Rael v. Smith's Food & Drug Centers, Inc.,* 712 F. App'x 802, 804 (10th Cir. 2017) (quoting *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 209 (1985)). Section 301 has a preclusive effect "such that '[a] state rule that purports to define the meaning or scope of a term in a contract suit ... is pre-empted by federal labor law.'" *Id.* (quoting *Allis-Chalmers,* 471 U.S. at 210). "In *Allis-Chalmers,* the Supreme Court extended this rule beyond breach of contract claims, stating that 'questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.'" *Id.* (quoting *Allis-Chalmers,* 471 U.S. at 211). "Ultimately, the Court held that preemption depends on 'whether evaluation of the tort claim is

inextricably intertwined with consideration of the terms of the labor contract.'" *Id*. (quoting *Allis-Chalmers*, 471 U.S. at 213).

> *Rael* summarized a later Supreme Court ruling on § 301 preemption as follows:
>
> Applying this test, the Supreme Court held in *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 401 ... (1988), that a state law claim alleging a retaliatory discharge for filing a workers' compensation claim was not preempted by § 301. The Court reasoned that the "purely factual questions" necessary to prove the elements of this claim could be determined without interpreting any term of a CBA. *Id*. at 407 ... (noting the factual issues were whether an employee was discharged or threatened with discharge and whether the employer's motivation was to deter the employee from exercising his workers' compensation rights). Thus, under *Lingle*, "an application of state law is preempted by § 301 ... only if such application requires the interpretation of a collective-bargaining agreement." *Id*. at 413....

*Rael*, 712 F. App'x at 804-05. In other words, even if dispute resolution pursuant to a CBA, on the one hand, and state law, on the other, would require addressing "precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 purposes." *Lingle*, 486 U.S. at 410. Section 301 preemption merely ensures that federal law will be the basis for interpreting CBAs; it says nothing about the rights a state may provide workers when adjudication of those rights does not depend on interpretation of a CBA. *Id*. at 409. *See Ballou v. United Parcel Serv., Inc*., No. 20-2640-JWB, 2021 WL 1056430, at *3 (D. Kan. Mar. 18, 2021).

### D. Kansas Tort Claims

i. Negligent misrepresentation. The elements of a claim for negligent misrepresentation are: "(1) [t]he person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating it; (2) the party receiving the false information reasonably relied on it; and (3) the person relying on the false information is a person or one of a group of persons for whose benefit and guidance the information is supplied or a person or one of a group of persons to whom the person supplying the information knew the information would be

communicated by another; and (4) the party receiving the information suffered damages." *Benge v. United Parcel Serv., Inc*., No. 2:22-CV-002231-EFM, 2022 WL 7484632, at *3 (D. Kan. Oct. 13, 2022) (citing *Rinehart v. Morton Bldgs., Inc*., 297 Kan. 926, 305 P.3d 622, 630 (2013)).

ii.   Fraud/Intentional misrepresentation. The elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment. *Alires v. McGehee*, 277 Kan. 398, 398, Syl. ¶ 3, 85 P.3d 1191, 1193 (2004).

iii.   Fraud by silence.   The elements of fraud by silence are: (1) The defendant had knowledge of material facts that the plaintiff did not have and could not have discovered by the exercise of reasonable diligence; (2) the defendant was under an obligation to communicate the material facts to the plaintiff; (3) the defendant intentionally failed to communicate to the plaintiff the material facts; (4) the plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and (5) the plaintiff sustained damages as a result of the defendant's failure to communicate the material facts to the plaintiff. *Stechschulte v. Jennings*, 297 Kan. 2, 21, 298 P.3d 1083, 1097 (2013) (citing *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 260, 978 P.2d 922 (1999); PIK Civ. 4th 127.41.)

**III. Analysis**

**A.   Representation of $30 per hour for Feeder Driving**.   In addressing *Garmon* preemption on Defendant's motion to dismiss, the court concluded Defendant had "fail[ed] to show that insofar as Plaintiffs' claim is based upon alleged misrepresentations occurring prior to their employment, the claim is one that could have been presented to the NLRB." (Doc. 16 at 9.) That determination was based solely on the facts alleged in the complaint, which said nothing about grievances by Plaintiffs, unfair labor practice charges, or actions by the NLRB. Based on

the uncontroverted facts on summary judgment, the court now concludes that insofar as Plaintiffs'
claims are based on allegations that UPS misrepresented that the pay for Feeder Driver work would
be $30 per hour, any such claim is preempted under *Garmon*.  Moreover, even if *Garmon*
preemption did not apply to this particular claim, the claim would fail on the merits.  Plaintiffs
allege that UPS falsely represented during informational meetings that Plaintiffs would be paid
$30 for Feeder Driver work.  UPS initially paid that rate but reduced it after expiration of the MRA,
prompting one or more Plaintiffs to pursue grievances and for the Union to file an unfair labor
practice charge (the MRA ULP) claiming Plaintiffs were entitled to the $30 rate.  UPS ultimately
settled that grievance, agreeing to pay Plaintiffs and other affected members back pay and restoring
them to the $30 MRA rate.  Based on the settlement, the NLRB approved the Union's withdrawal
of the MRA ULP.  These facts indisputably show one of two things: either the MRA rate was
"arguably" enforceable under the NLRA (and thus within the exclusive jurisdiction of the NLRB),
or UPS's representation that Plaintiffs would be paid a $30 rate for Feeder Driving was in fact true
and cannot support a claim for fraud or misrepresentation, each of which require proof of a false
statement, or a claim for fraud by silence, given that Defendant communicated the $30 pay rate to
Plaintiffs.

The fact that the NLRB accepted jurisdiction of the MRA ULP and then deferred a
determination to allow the grievance/arbitration process to proceed, that Defendant ultimately
agreed to provide back pay and to pay the MRA rate going forward, and that the NLRB approved
dismissal of the MRA ULP based upon the parties' settlement, all indicate that this matter
presented an arguable claim for relief under the NLRA for violation of Defendant's duty to bargain
collectively and in good faith under 29 U.S.C. § 158(d).  Under *Garmon*, such a fact placed the
matter within the exclusive jurisdiction of the NLRB and deprives this court of jurisdiction over

the matter.  Even if that were not the case, however, for reasons indicated above —including that the representation of a $30 pay rate for Feeder Driving was ultimately proven to be true—Defendant would be entitled to summary judgment on the merits insofar as Plaintiffs' claims are based upon Defendant's alleged misrepresentations of the Feeder Driver rate.

  B. **Representation of $25 rate for Hub work**.  The court similarly concludes that *Garmon* preemption applies to Defendant's alleged misrepresentation that Plaintiffs would be paid $25 per hour for non-feeder Hub work.  Plaintiff Martinez charged that the Union violated its duties under the NLRA by not bringing a ULP charge to enforce Defendant's alleged promise to pay $25 per hour for this work.  The NLRB reviewed Martinez's charge but dismissed it.  In so doing it noted that although Union officials had not heard Defendant promise $25 for Hub work, the Union nevertheless processed the grievance and discussed it in a joint grievance committee, postponing it twice before determining there was no contract violation.  (Doc. 72-25 at 2.)  In dismissing Martinez's Hub ULP charge, the NLRB said that oral agreements to modify a CBA could be enforceable under section 8(d) of the NLRA, but "given that the agreement [to pay $25 for Hub work] was not reduced to writing, it is understandable that the Union would be reticent to file a grievance where the likelihood of success was slim."  (*Id.*)  The NLRB accordingly rejected Martinez's claim—not because the NLRB could not legally decide in Plaintiffs' favor, or because the allegations could not possibly support relief under the NLRA—but because the Union reasonably believed that evidentiary hurdles made it unlikely the Union could show that Defendant promised to pay $25 for Hub work.  The NLRB thus found the Union did not violate its duties under the NLRA.

  The court finds Defendant has now met its burden to show that such activity was "arguably" subject to the NLRA.  With limited exceptions, "neither state nor federal courts possess

jurisdiction over claims based on activity that is 'arguably' subject to §§ 7 or 8 of the NLRA." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 74 (1989). "Arguably" means "the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor." *Int'l. Longshoremen's Assn., AFL-CIO v. Davis*, 476 U.S. 380, 395 (1986). In other words, that party must advance an interpretation of the NLRA "that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board," and then "put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation." *Id.*

Case law supports a conclusion that the activity complained of here—Defendant's failure to follow through on a representation that it would pay Plaintiffs $25 for Hub work—is arguably within the coverage of the NLRA. In *Ackers v. Celestica Corp.*, 274 F. App'x 450 (6th Cir. 2008), factory workers sued for fraud based on alleged misrepresentations, by both the owner of the factory and a company purchasing the factory, that the factory would remain open in Columbus, Ohio, for at least five years. The plaintiffs altered their retirement plans and made wage concessions in reliance on the representations, which were made both before and after the parties entered into a CBA. Plaintiffs later sued for fraud when the factory was closed about a year after the sale. The Sixth Circuit found the fraud claim was preempted because "[a] unilateral action or bargaining in bad faith concerning a subject of mandatory bargaining [including the terms of a CBA] violates 29 U.S.C. § 158(d)." *Id.* at 451-52. Section 158(d) obligates an employer to confer in good faith with its employees' representative with respect to wages and the negotiation of an agreement. *Id.* at 452. The defendant's false representations amount to "a failure to bargain in good faith regarding each of the above mandatory subjects of bargaining," which "constitutes an

unfair labor practice under § 158 … [and therefore] must be heard before the National Labor Relations Board, and not in district court." *Id.*

In *Ballard v. American Airlines, Inc.*, No. 17-cv-2534, 2017 WL 6988654 (N.D. Ill. Dec. 18, 2017), the plaintiff quit his job and took a position with the defendant in reliance on defendant's representations about benefits under its hiring program. Two months later the defendant informed the plaintiff it was ending the program, leaving him with reduced pay and benefits. Plaintiff asserted fraud and other claims and argued the claims were not preempted because they "arise not from any CBA, but from an individual oral agreement made before Plaintiff was hired and before Plaintiff became a union member." *Ballard*, 2017 WL 6988654, at *3. The court rejected that argument because any individual agreement was superseded by the CBA. It also found that plaintiff's fraud and negligent misrepresentation claims "arose from the collective bargaining negotiations … memorialized in the CBA …, which effectively changed the terms of Plaintiff's employment," and that these claims were likewise preempted based on Supreme Court case law holding that uniform federal law must govern the negotiation of labor agreements and the resolution of labor disputes. *Id.*

These cases and others show that representations analogous to those alleged by Plaintiffs could be considered violations of the employer's duty under the NLRA to bargain collectively and in good faith with the representative of its employees. *See* 29 U.S.C. § 158(d); *Medo v. Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684 (1944) ("That it is a violation of the essential principle of collective bargaining and an infringement of the Act for the employer to disregard the bargaining representative by negotiating with individual employees, whether a majority or a [minority], with respect to wages, hours and working conditions was recognized by this Court in *J.I. Case Co. v. Labor Board*, 321 U.S. 332, 64 S. Ct. 576."). As indicated previously, several

cases have found state law claims may be preempted even where the employer's challenged representations were made to the plaintiffs before those plaintiffs became employees subject to a CBA.  Moreover, the uncontroverted facts here show that the NLRB considered Defendant's representation about a $25 Hub rate to be potentially enforceable as an oral modification of the CBA.  This is true regardless of whether Plaintiffs themselves regarded the representation as such and despite the fact they "are not [now] arguing that UPS did not bargain in good faith at the time of their recruitment."  (Doc. 75 at 17) (quotation marks omitted.)  And although the Union ultimately declined to pursue a charge because of evidentiary hurdles, and the NLRB found this did not violate the Union's duties, Defendant's alleged misrepresentation was "arguably" covered by the NLRA and thus preempts Plaintiffs' state law claims.

Defendant has cited sufficient evidence to show that the NLRB could have legally and reasonably upheld a claim against Defendant based on an interpretation of the NLRA that would consider Defendant's alleged misrepresentation of a $25 Hub rate to have been a violation of its duties under 29 U.S.C. § 158, including the duty to bargain collectively and in good faith with the employees' representative with respect to wages.  *See also Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 659 (7th Cir. 1992) (fraud claim was preempted under *Garmon* because the conduct was arguably a failure to bargain in good faith and thus an unfair labor practice.)  "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted."  *Garmon*, 359 U.S. at 245.  This is true even where—as here— it is not certain that the activity is in fact prohibited by the NLRA. *Id.* at 244-45 ("At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to

the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board.")  The court concludes that Plaintiffs' state law claims based upon alleged misrepresentation of a $25 per hour Hub pay rate are preempted under *Garmon*.

      **C.**   **Representation of full-time work.**  Plaintiffs contend Defendant also falsely represented that if they were laid off from feeder-driver work they "would be guaranteed" full-time work in the Hub.  (Doc. 70 at 5.)  For the same reasons indicated above, the court concludes that Plaintiffs' state law tort claims based on this misrepresentation are preempted under *Garmon*. Like the promise of a $25 hourly rate for Hub work, the alleged representation that Plaintiffs would be "guaranteed" full-time work in the Hub in the event they were laid off from feeder driving could be considered "a failure to bargain in good faith regarding [the] … mandatory subjects of bargaining," and arguably "constitutes an unfair labor practice under § 158 … [and therefore] must be heard before the National Labor Relations Board, and not in district court."  *Ackers*, 274 F. App'x at 452.  *Cf. Moreno v. UtiliQuest, LLC*, 29 F.4th 567, 574-575 (9th Cir. 2022) (finding fraud claim preempted by *Garmon* because the plaintiff's fraud allegations "touch on conduct clearly covered by the NLRA."); 29 U.S.C. § 158(d) (the mandatory subjects of bargaining include wages, hours, and other terms and conditions of employment).

      Based on the uncontroverted facts, the court concludes Plaintiffs' state law claims are preempted under *Garmon*.  In view of that conclusion, the court does not reach the other issues raised by the parties on summary judgment.

      **IV.  Conclusion**

      Defendant's motion for summary judgment (Doc. 71) is GRANTED.  Due to federal preemption outlined in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959),

Plaintiffs' state law claims are DISMISSED without prejudice.   IT IS SO ORDERED this 9th day of January, 2023.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE